GIDEON SCULL and NEWCOMB B. THOMPSON v. THOMAS
REEVES, DANIEL B. REEVES, GEORGE W. GARRISON
and others.

If a debtor execute an assignment under the statute of New-Jersey, for the
benefit of his creditors, annex thereto an inventory of his property and a
list of his creditors under oath, and deliver it to the assignee, who receives
it, understanding its objects and effect; the act of the assignor is complete,
and he is divested of his estate, although the deed were not acknowledged.
A trust is created, and the beneficial interest vested in the creditors, the
*cestui que trusts*, though they knew nothing of it.

There is no particular formality necessary to the acceptance of a trust.   If a
person actually consent, or if he go to the property and exercise any power
or right over it, it may be considered an acceptance, and especially when
the rights of third persons are interested.

It is not necessary that there should be an actual consent either in writing or
by parol; acts fairly implying a consent are sufficient.

An assignee is at liberty to refuse to act: no man can be made a grantee
against his will.

If one of two assignees refuses to act, the trust is not thereby destroyed, but

the whole estate vests in the other, and he alone is competent to execute the trust.

If the deed of assignment be executed and delivered, and the trust accepted, the trustee cannot, by surrendering or cancelling the deed, destroy the trust, or impair the rights of the *cestui que trusts.*

If the answer of one of the defendants is not full and satisfactory as to any one of the grounds of equity set up in the bill, the injunction cannot be dissolved.

Where transactions are charged involving fraud, either actual or constructive, and especially where direct interrogatories are put in relation to particular facts, the court cannot be satisfied with a general answer, or one in any way evasive.

BILL for injunction and relief, filed twenty-seventh February, 1834. The bill was exhibited by the complainants for and on behalf of themselves, as creditors of Thomas Reeves, and of all such other creditors of the said Thomas Reeves as should come in and contribute to the expense of the suit, or be otherwise entitled to avail themselves of its benefit. The nature of the bill, and the character of the relief sought, will be found stated in the opinion of the chancellor. On filing the bill an injunction issued to restrain the sheriff of the county of Salem, and the several judgment creditors of Thomas Reeves, from seizing or selling any of the trust property covered by the assignment specified in the bill. Answers were filed on the eighteenth of March, 1834, and notice given of an application to dissolve the injunction. The cause was heard at April term, upon the motion to dissolve, on bill and answer.

*L. Q. C. Elmer* and *Jeffers,* for defendants, in support of the motion.

*Wall,* for complainants, contra.

THE CHANCELLOR. The bill charges, that Thomas Reeves, of Salem, was indebted to the complainants on the eighteenth February last, in the sum of eleven hundred and ninety-seven dollars and forty-two cents, on a promissory note payable on the twenty-seventh

[Scull and Thompson v. Reeves et al.]

of March. On the seventeenth of February, Richard Moore entered up judgment against Reeves and one James W. Mulford, for sixteen hundred dollars, in the Salem pleas, and an execution was forthwith delivered to the sheriff of the county, directing him to levy and make thereon the sum of seven hundred and twenty-four dollars and sixteen cents of debt, and five dollars costs of suit. On the eighteenth of February, Thomas Reeves executed an assignment of all his real and personal property to his son, Daniel B. Reeves, and George W. Garrison, in trust for the benefit of his creditors, in pursuance of the act of 1820, and annexed to the assignment a schedule of his property and list of creditors, under oath, and duly acknowledged it. The deed of assignment was delivered on the same day to George W. Garrison, one of the assignees, who, as the complainants believe, was present at the time of the execution of it, and took it into his possession. On the same day, or the day after, he went to the house of Reeves, took possession of all his estate, real and personal, locked up his store and took the key into his possession, and exercised various other acts of ownership over the said property, evincing his acceptance of the trust, and drew up the notice required by the third section of the act respecting assignments, mailed the same in the post-office at Salem to be inserted in one of the newspapers in Philadelphia, and afterwards took the same out of the office.

After the acknowledgment and delivery of the said asssignment, and after Garrison had accepted of the trust, viz. on the eighteenth of February, and about *two hours* after the execution of the deed, Thomas Sinnickson entered up judgment in the Salem pleas against Reeves for four hundred dollars debt, besides costs, and sued out execution and delivered it to the sheriff.

On the nineteenth of February, Robert H. Van Mater entered up a judgment against Reeves for the sum of eight hundred dollars, and sued out an execution thereon. On the same day he entered up another judgment against Reeves, for seven hundred and forty dollars of debt, and sued out execution thereon.

The complainants then charge, that on the twentieth of the same month of February, Reeves, at the instance of Van Mater,

became desirous to destroy the assignment, and for that purpose procured Daniel B. Reeves, one of the said assignees, to execute an instrument in writing, renouncing the trust; and also procured George W. Garrison to return the deed of assignment to him, Reeves, and return to him the possession of the real and personal estate, which was accordingly done.

After this, to wit, on the twentieth and twenty-second of February, sundry creditors of the said Thomas Reeves, viz. Robert H. Van Mater, Stoughton and Belden, Morgan and Buck, Samuel C. Dunn, and Rhoda Mulford, entered up judgments against him, and issued executions, and placed them in the hands of the sheriff of the county of Salem.

The bill charges that the judgment creditors had knowledge of the execution and delivery of the assignment at the time of entering up their judgments, respectively; that the sheriff has taken possession of all the property, and threatens to advertise and sell the same, and apply the proceeds to pay and satisfy the executions; that the assignees refuse to carry into effect the trusts in the deed of assignment—Daniel B. Reeves refusing to accept or act in any way, and Garrison, though he accepted the trust, refusing now to act any further or to carry the same into effect.

The bill prays that the assignment, and the trusts therein contained, may be established and carried into execution under the direction of this court, and that the trustees may be decreed to execute the trusts according to the statute; or that they, or either of them, may be discharged therefrom, and that one of them may act, or a new assignee be appointed, to whom the trust estate shall be conveyed; and that the said judgments, so entered up after the execution and delivery of the said assignment, be decreed to be no lien on the said trust property; and that the estate may be applied, under the direction of the court, to the uses and purposes expressed in said assignment, for the equal benefit of all the creditors; that, if need be, a receiver may be appointed, and also an injunction issue to restrain the sheriff from selling under the executions.

[Scull and Thompson v. Reeves et al.]

An injunction was ordered on the twenty-seventh of February, since which the several defendants have answered.

Thomas Reeves states, that being unable to raise money to satisfy the first judgment and execution against him, his great object was to obtain time, believing that he could convert his property into money and turn it in the payment of his debts better than any other person or persons could do. Not fully understanding the nature and force of an assignment under the laws of New-Jersey, he was induced to believe that by making an assignment he would have a chance to turn himself so as to be able to sell his property and pay all his just debts. Under this impression he applied to George W. Garrison, and requested him to act as his assignee, to which he assented; and thereupon this defendant ordered an assignment to be drawn, constituting the said Garrison, and defendant's son, Daniel B. Reeves, his assignees; which assignment was executed in the presence of a subscribing witness, but was not acknowledged.

He further says, that he made a list of his property and of his creditors. This was in the evening of the eighteenth February, and George W. Garrison took possession of the assignment, Daniel B. Reeves not being present. He did not solicit Daniel to act, but concluded he would not refuse. Next morning, Garrison came to the store, and began to talk about shutting it up. This was unexpected to defendant. He did not contemplate such a course of proceeding; for he had that morning, before Garrison came, opened his store, sold some articles, and one of his creditors calling, he had delivered him articles to the amount of upwards of twenty dollars in payment of a debt. The store was shut up by order of Garrison, and Daniel B. Reeves held the key. Next morning they all met at Salem; and Daniel B. Reeves, one of the assignees, having declined accepting the trust, he was advised that the assignment had no legal force, and believing that he could make arrangements with his creditors to give him time, and that he had property enough to pay his debts, and could manage it better than the assignees or any other persons, he requested Garrison to deliver up the assignment to be

cancelled. He did deliver it up, and this defendant cancelled it.

He admits the several judgments and executions, and says, if he had been allowed to settle his affairs himself, and had obtained the time of one year, which doctor Van Mater and Stoughton and Belden agreed to give him, and which agreement he understood was assented to by Thomas Sinnickson, he has no doubt he could have paid all his just debts and would have had a large surplus. He insists that he had a, legal right to cancel the assignment; that no estate passed by it, nor did it create any trust; that the assignment failed to take effect, and was cancelled without any fraud, collusion or combination with any person or persons; not with the design of affecting the complainants, or other creditors, but with a view of replacing things in the same condition they were in before the execution of the assignment.

George W. Garrison says, in his answer, that Reeves called on him on the eighteenth of February, and proposed an assignment. He consented to act as one of his assignees. The assignment was drawn and executed, but not acknowledged, and delivered to him the same evening. Schedules of property and debts were made out, sworn to, and annexed to the assignment. Next morning, the nineteenth, he went to the store. Daniel B. Reeves and Thomas Reeves were there. Thomas appeared to consider the assignment as an instrument to keep off his bond and other creditors from bringing suits, and enable him to make sale of his property himself. Defendant requested Daniel B. Reeves to lock up the store for the present, and proposed that he and his father should come to Salem the next morning. They all met at Salem, when Thomas Reeves, believing he could obtain time from his creditors and could pay all his debts without great sacrifice, and do better than the assignees could, requested defendant to give up the assignment to be cancelled. Daniel B. Reeves having declined acting, defendant was advised that in consequence thereof the assignment could not be carried into effect, and that he might lawfully deliver the said assignment; he accordingly did deliver it to the said Thomas Reeves, for the pur-

12

pose of having it cancelled. The defendant admits that he drew a notice for creditors, and it was withdrawn, and also that he requested Daniel B. Reeves to shut up the store. He admits, also, that he stated or mentioned that an assignment had been made to him and Daniel B. Reeves, and he informed some of the creditors of it; and that he requested that the goods sold by Reeves on the morning of the nineteenth, in satisfaction of a debt, should be returned.

Daniel B. Reeves, the other person named as assignee in the deed of assignment, says he was not consulted, or requested to act as assignee, nor did he consent in any manner to act; but at the request of Garrison he shut up the store and took the key. That on conversing with his father he found that he was under a misapprehension as to the legal effect of the instrument, and without any collusion with his father or any other person, declined accepting the trust. He never saw the deed, nor does he know of it except from information.

The answers of the judgment creditors will be adverted to hereafter, if it shall become necessary.

Upon this state of facts, it is insisted that the injunction should be dissolved. The principal ground taken is, that no assignment was actually made; that the property never passed out of Thomas Reeves so as to vest in the assignees, and of course that no rights vested in the complainants and other creditors as *cestui que trusts.*

The assignment appears to have been prepared under the act, entitled, "An act to secure to creditors an equal and just division of the estates of debtors who convey to assignees for the benefit of creditors," passed the twenty-third of February, one thousand eight hundred and twenty. That act prescribes no particular mode in which such conveyances shall be made; and in the absence of any direction, we are to take it for granted that the usual formalities necessary to pass real and personal estate are to be observed. There must be a proper deed of conveyance, proper parties, and a due and proper execution. It must be signed, sealed and delivered.

[Scull and Thompson v. Reeves et al.]

In this case, Thomas Reeves proposed to make an assignment of his property. An execution had been issued against him, which at the time he was unable to meet, and he called on Garrison to be one of his assignees, with his son, Daniel B. Reeves. Garrison consented to act; and thereupon Reeves had the instrument prepared. He signed and sealed it; and after making out an inventory of his property and a list of his creditors, under oath, and annexing it to the deed, he delivered it to Garrison, who received it, understanding what the object and effect of it were. That it was not acknowledged is not material. Proof by the subscribing witness would have had the same effect, and such proof was not necessary to the validity of the act on the part of the grantor. It was only important in case it had been desirable to have the assignment recorded, and the act does not fix any specific time within which it must be recorded.

The act was then complete, so far as Thomas Reeves was concerned. He had done all that was needful for him to do, and so far as the divesting of the estate depended on his act, it was accomplished.

George W. Garrison, one of the assignees named in the deed, accepted the trust. His answer is full, or at least sufficiently so to justify that conclusion; but he insists, that as the other assignee renounced, he was advised that he was under no obligation to act, and delivered up the deed to be cancelled. How far he was correct in the conclusion, may be inquired into hereafter. It is necessary here to see whether Reeves, the other assignee, did or did not accept; and whether his renunciation was not at the instance of the assignor, and made expressly to defeat the assignment. The answer of Daniel B. Reeves is not as full and satisfactory as could be wished; and this is the more to be regretted, as the situation of the property and parties makes it important to settle the principles of the case upon this motive, if it can be done consistently. He states, that on the morning of the nineteenth, he was informed by George W. Garrison that his father had made an assignment, and appointed Garrison and himself assignees. Where he was informed of this; and whe-

ther, upon such information, he went to the store, or only happened there; or whether he lived there; and whether he knew, or had heard of the assignment from any other source, before that information given him by Garrison, does not appear. Garrison and he were at the store. They were there either as assignees, or persons about to enter upon their duties as assignees. Reeves knew that the assignment had been made; that Garrison and himself had been appointed assignees; that Garrison was there in that capacity, in virtue of the assignment. Did he then refuse to act? Not at all; but on the contrary he, at the request of Garrison, locked up the store, and put the key in his pocket. Why take this responsibility, if he intended to have nothing to do with the assignment?

There is no particular formality necessary to the acceptance of a trust. If a person actually consent, or go to the property and exercise any power or right over it, it may be considered an acceptance, and especially where the rights of third persons are interested. It is not necessary there should be an actual consent, either in writing or by parol; acts fairly implying a consent are sufficient. In respect of this matter, the answer of Reeves is not satisfactory, and does not fully answer the equity of the bill. He did certain acts, but he says he did not act in any manner as assignee; yet I think it plain that he appeared there as assignee. He went with his co-assignee; they took possession of the property in the store, and it was no longer in Thomas Reeves.

After this, as appears by the answer, the son seeing the father greatly dissatisfied, and very anxious to avoid the operation of the assignment, concluded not to accept, but to go to Salem and take advice; and upon advisement, he executed a renunciation.

It is charged expressly in the bill, that this renunciation was fraudulent; and Daniel B. Reeves was expressly required to answer on his oath, whether the renunciation was at the request or instance of the said Thomas Reeves, and designed and intended to defeat the trust. To this he says, that he declined the acceptance in consequence of the difficulties which he perceived would

be in his way, and without any *collusion* with his father or any other person. This is not a full and explicit answer. The defendant might well have renounced at the request of his father, and yet be under the impression that there was no collusion. Whether he did it at the instance or request of his father, he does not answer; nor has he paid any attention to the inquiry, whether the renunciation was designed and intended to defeat the trust.

The answer of this defendant not being full and satisfactory as to the acceptance of the trust, and as to the object, intent and reason of relinquishing or renouncing it; and the acceptance and subsequent fraudulent relinquishment being one of the grounds of equity set up in the bill—the injunction cannot be dissolved, even if there were no other grounds for retaining it.

But it is charged that the creditors, when they entered up their judgments, knew of the assignment; and that Reeves, the assignor, at the instigation of Van Mater, one of the judgment creditors, became desirous to destroy the validity of the assignment; and it is inquired whether the deed was delivered up at the request of said Van Mater, or any other of the judgment creditors, and which of them, and in their or either of their presence? Van Mater does not deny the fact of knowledge. It is true he absolutely denies any knowledge of the assignment except from hearsay. That was sufficient knowledge; and it is plain from the answer, though he neither expressly admits or denies it, that he understood that an assignment had been made at the time of entering up his judgments. Sinnickson says he heard a rumor that an assignment was about to be made, and therefore he hastened to get his judgment; but he does not answer the interrogatory, whether the deed was delivered up at his request as one of the creditors. There is not a word about it in his answer. This is singular, and the more so when it is seen by the answer of Thomas Reeves, that he believed, by cancelling the assignment, he could make an arrangement with his creditors to give him time; and he states further, that Van Mater and Stoughton and Belden, agreed to give him one year's time,

and he understood this agreement was assented to by Sinnick son. Van Mater denies that the assignment was delivered up at his instigation.

If there be any equity growing out of the fact that these judg ment creditors knew of the assignment when they procured their judgments, then, it is admitted by Van Mater, or certainly not denied. If any equity growing out of the fact that the deed was delivered up at the request of the judgment creditors, or some of them, then Sinnickson has failed to deny that equity ; for in his answer he says nothing on the subject. In these as well as in some other matters, the answers appear to be hastily and rather loosely drawn. And where transactions are charged involving fraud, either actual or constructive, and especially where direct interrogatories are put, in relation to particular facts, the court cannot be satisfied with a general answer, or one in any way evasive. It furnishes in this case an additional ground for re taining the injunction.

But grant, for the sake of argument, that there is no evidence of an acceptance on the part of Reeves, and that the delivering up of the assignment was without the instigation, advisement or knowledge of any of the judgment creditors; divest the case of all fraud, actual or implied—have the complainants no equity to sustain their injunction ? Was there no trust created by the exe cution of the deed, the annexation of the schedule and inventory under oath, and the delivery of the deed to Garrison, the as signee ? Here was an actual and voluntary delivery by the gran tor. He parted with his interest as far as it depended on any act of his. A trust was created ; the beneficial interest vested in the creditors, the *cestui que trusis*, though they knew nothing of it. If Reeves refused to act—and he was at liberty to do so, as no man can be made a grantee against his will—the trust was not thereby destroyed. It vested in Garrison, the remaining trustee, who had accepted, and he was competent to go on and execute the trust.

There is an old manuscript case cited in 3 *Eq. Ca. Ab.* 742, and said to have been decided at the rolls in 9 Geo. 2, which

[Scull and Thompson v. Reeves et al.]

holds the doctrine, that where two are appointed joint trustees of real and personal estate, if during their joint lives, one of them refuses to act, the other cannot act without him; but the trust devolves upon the court. If this was ever the doctrine of this court, it is not so at this time. It is now held, that where two trustees are appointed, and one dissents, the whole estate vests in the other: *Crewe* v. *Dicken*, 4 *Ves.* 100. In a later case in 2 *Swans.* 365, *Nicloson* v. *Wordsworth*, lord Eldon recognized the doctrine, and says: It seems to have been taken for law, from an older period than the date of *Crewe* v. *Dicken*, and sanctioned by lord Hale, that if an estate is conveyed to two persons in trust, and one will not act as trustee, the estate vests in the other; and he decided that a release by the trustee was equivalent to a disclaimer. The case decided by lord Hale is from *Vent.* 128, (*Smith* v. *Wheeler*.) Property was conveyed to B. and C. upon certain trusts, and B. dissented. The plaintiff, claiming under a demise by C., recovered. Lord Hale is reported to have said, " C. is a good lessor, for the other trustee's disagreement makes the estate wholly his." A variety of old cases are referred to, but it is considered unnecessary to cite them. The principle is recognized in the late case of *Adams* v. *Taunton*, 5 *Mad.* 438, and *Jeremy's Eq. Jur.* 138, and may be considered as settled law.

If, then, a trust was created for the benefit of the creditors, it is the duty of the court to see that it is properly executed; and it is not seen as yet, that the powers of the court are incompetent in this case to protect and secure the rights of all parties.

It is not necessary, perhaps not proper, in deciding this motion, that I should say more.

The injunction must be retained for want of sufficient answers, and I incline to the opinion it should be retained on the merits of the case so far as at present developed.

Motion denied.